290 So.2d 375 (1974)
SUBDIVISION PLANNING ENGINEERS, INC.
v.
MANOR DEVELOPMENT CORPORATION and Trinity Universal Insurance Company.
No. 5683.
Court of Appeal of Louisiana, Fourth Circuit.
February 15, 1974.
Rehearing Denied March 8, 1974.
*376 Greenberg, Cohen & Dallam, (Nathan Greenberg) Gretna, for plaintiff-appellee.
Zeringer & Zeringer (Harold J. Zeringer, Jr.), James H. Drury, and Bienvenu & Culver (P. A. Bienvenu), New Orleans, for defendants-appellants.
Before STOULIG, J., and MALIK and MARINO, JJ. Pro Tem.
STOULIG, Judge.
Plaintiff, Subdivision Planning Engineers, Inc., filed suit to recover a $57,240 balance it alleged is due for engineering *377 and surveying work performed in the Live Oak Manor Subdivision near Waggaman, Louisiana. Alternatively, plaintiff sought a judgment in quantum meruit. It further prayed for recognition of its lien on all 1,129 lots of the subdivision. Named defendants were the owner and developer, Manor Development Corporation (Manor), and Trinity Universal Insurance Company, who furnished the lien bond to effect the cancellation of the recorded encumbrances against the subdivision so that individual houses could be sold.
From a judgment awarding plaintiff $21,540 and recognizing lien rights on 534 of the lots, the defendants have appealed. Plaintiffs have answered the appeal seeking an increase in the award.
Before considering the merits, we point out that we will not apply the presumption that the findings of the trial court are correct. This is so because this matter was tried by one judge but decided by another. After Judge Frederick Heebe was appointed to the federal bench before the trial was concluded, counsel stipulated his successor, the Honorable Frank Zaccaria, could adjudicate this cause on the evidence previously adduced. Since Judge Zaccaria did not have the opportunity to observe the witnesses as they testified his factual findings cannot be accorded the weight usually assigned to a trial judge's conclusions of fact. Smythe v. Great American Indemnity Co., 35 So.2d 267 (La.App. 2d Cir. 1948); Walker v. Mire, 197 So. 798 (La.App. 1st Cir. 1940).
Turning to the merits, the record indicates MacDuff Fletcher of Manor entered into preliminary negotiations with Ralph Davenport and John Mitchell, the principals of plaintiff corporation, to obtain preliminary engineering and surveying services in laying out a subdivision defendant planned to develop. The principals of Manor were Fletcher, James Culotta and Joseph Montaldo.
The testimony of Fletcher, Davenport and Mitchell is in accord on these points: plaintiff was asked to engineer and survey the entire subdivision which was to be composed of 1,129 lots; plaintiff was not advised that Manor did not own the entire tract when its services were requested; plaintiff's agents did not inquire whether Manor owned the entire tract before commencing work; plaintiff agreed to undertake the contract for a total price of $67,540 and at defendant's request figured the job on a unit basis arriving at a $60-per-lot figure; and plaintiff had performed a substantial amount of the work required under the contract by June 22, 1959.
During the first six months of 1959, defendant's principals began implementing their plans so that construction could begin once the preliminary engineering and surveying were complete. They formed three business entities, i. e. Manor Development Corporation, Mercury Construction Company, Inc., and M. M. & J. Co., a partnership. Through the various companies, defendant's principals obtained 500 FHA loan commitments (250 operative builders commitments and 250 conditional commitments). Interim financing with the National Bank of Commerce and permanent financing with Fidelity Bond and Mortgage Co., Inc., had been arranged by Manor for the proposed construction.
On June 22, 1959, at which time plaintiff was already furnishing services, Fletcher, acting as an officer of Manor, wrote the following letter to the plaintiff corporation summarizing their verbal contract:
"This letter will serve to confirm our agreement and understanding relative to the services and work which you are performing and rendering for us in Live Oak Manor Sub-Division, Jefferson Parish, Louisiana.
"You have undertaken for us to do all of the preliminary surveying and engineering, including installation of square cornered stakes, roadway design, drainage, water, and sewer layout design, the establishing of base control lines in Live *378 Oak Manor Sub-Division, containing 1129 lots, of Jefferson Parish, all for the sum and price of $60.00 per lot, plus the exclusive rights for the closing surveys at a price of $30.00 per lot (consideration for these closing surveys to be paid at act of sale). The total contract price, based on 1129 lots at $60.00 per lot is $67,740.00.
"Said sum of $60.00 per lot is to be paid in three payments of $20.00 each, as the developer receives its payments. It is further understood and agreed that the above price shall cover only the cost of installing the initial stakes. Your responsibility includes checking the off-site contractor's work, to preclude errors on his part which might cause delay.
"A substantial part of this work has already been completed and accepted, in fact, commitments have already been received from the FHA as to a part of the sub-division.
"The purpose of this letter is to properly reflect our agreement and our records show that you have already received payments totaling $2,590.14 from us against the total contract price. The remainder of the funds due you will, of course, only be paid to you as we receive funds under our owner-builder commitments."
It was not until three days later (June 25) that M. M. & J. Co. acquired the entire tract of ground, consisting of 1,129 lots, of which it conveyed only 534 sites to Manor for development.
On July 30, 1959, the Jefferson Parish Council adopted an ordinance accepting the plan of subdivision of the 1,129 lots prepared by plaintiff.
Almost from the outset, the developer encountered financial difficulties. First, the National Bank of Commerce limited its commitment of interim financing to 100 homes; next the off-site improvements contract for the first section did not progress as anticipated; and when the homes were completed, the sales were slow. Although Manor obtained two further interim loans to finance construction of a total of 90 more homes, the project was doomed to financial failure.
In the spring of 1961, the two principal mortgage holders, Mehr, Inc. (M. M. & J. Co.'s vendor), and the National Bank of Commerce, interim financing institution, initiated foreclosure proceedings. At this point, defendant Trinity, surety on the performance bond of the on-site construction being built by Mercury Construction Co., intervened in an attempt to salvage what it could from the operation. Without going into great detail, we simply note Manor transferred the remaining 160 lots it owned to another corporation, Wiljon,[1] who was to undertake completion of the unfinished homes and also was to construct the balance of the houses for which FHA commitments had been issued. So that these properties could be sold, Trinity had executed a lien bond on October 17, 1961 and paid some $285,000 on previously recorded liens. However, the plaintiff's lien affidavit for $57,240 filed on September 14, 1961 was not one of those paid.
For the purpose of this litigation, it is not necessary to expand on all aspects of Manor's financial difficulties, other than one relating to the letting of the first off-site improvement contract in the amount of $180,000. Culotta questioned the payments of $88,000 to the contractor at a time when the completed work and the materials delivered to the job site were valued at substantially less than these funds authorized to be paid by Fletcher. Culotta charged it was Fletcher's negligent management which precipitated the financial crisis that ultimately cause defendant to fail. The disagreement over the letting of the off-site contract and payment thereunder culminated *379 in Fletcher's withdrawing as a participant in the developing corporations. Thus in evaluating Fletcher's testimony we are mindful of his past differences with Culotta.
On the foregoing evidence, the trial court concluded plaintiff was entitled to payment in the sum of $60 for each of the 534 lots actually owned by Manor, or $32,040, subject to a credit of $10,500 previously paid. In reviewing the contract and the testimony adduced we are not entirely in agreement with the trial court's conclusion.
On appeal, defendants would have us limit plaintiff's recovery to $60 per lot on the sites actually developed (a total of 190). It is conceded that plaintiff was due $900 more than it was paid. Or they suggest, if we base our judgment on quantum meruit, we should award plaintiff 5 percent of the total amount of the off-site improvement contracts let in the partial development of this subdivision. This is based on expert testimony that the engineering fees are normally 5 percent of the total contract consideration for off-site improvements. Plaintiff conversely seeks an increase of $57,240, the amount for which it originally filed suit.
As we read the written document, it fully supports the versions of the contracts voiced by plaintiff's representatives. Manor agreed to pay $67,740 for engineering and surveying work on the entire subdivision, containing 1,129 lots. Although defendant Manor only acquired title to 534 of them, nonetheless its vendor and also its principal, M. M. & J. Co., owned the balance of the 1,129 lots. In dealing with plaintiff, Fletcher represented that Manor would be the developer of the entire subdivision. This is reflected in the letter of June 22, 1959 signed by Fletcher as Manor's president.
Defendants would have us read into this agreement the stipulation that plaintiff would be paid for its services only if the lots were fully developed. The phrases they cite and rely upon are: "Said sum of $60.00 per lot is to be paid in three payments of $20.00 each, as the developer receives its payments," and "The remainder of the funds due you will, of course, only be paid to you as we receive funds under our owner-builder commitments."
Under the agreement plaintiff was unconditionally obligated to perform engineering and surveying services for the entire subdivision at a stipulated price. The reciprocal obligation of both parties was not a conditional obligation as outlined in LSA-C.C. art. 2021. Rather the quoted provisions merely outline a method of payment of the sums that will become due.
Because of the financial failure of Manor, the plaintiff did not fully perform the services for which defendant contracted. Under the circumstances we think plaintiff is entitled to a judgment in quantum meruit for services rendered on the entire tract consisting of 1,129 lots, even though Manor only took title to 534.
There is some testimony as to what services were actually performed, i. e. (1) preparing a topographical map; (2) developing a regular subdivision plot; (3) enlarging various sections thereof; (4) drawing and engineering master sewerage and drainage plans; (5) furnishing working plans for 591 lots; (6) revising plans for 125 lots to change curbs and gutters and subsurface drainage, etc. However, there is insufficient evidence to help us evaluate what percentage of the services outlined in the contract have actually been performed. We think the testimony of Davenport and Mitchell is too general. And while the developer's former representative Fletcher estimated that 75 percent of the work had been completed, in view of his severance with the defendant corporation, we find this unacceptable without more detailed corroborative evidence. Accordingly we will remand this matter for the limited purpose of permitting plaintiff to introduce evidence to support an award in quantum meruit.
*380 It is clear the plaintiff is entitled to a payment of $60 per lot for the 250 sites developed. With regard to the remainder of the 879 undeveloped sites in the subdivision, plaintiff is entitled to be compensated for its engineering services to the extent that the individual lots have been benefitted thereby.
As to that aspect of the judgment recognizing a lien in plaintiff's favor, both plaintiff and defendants have complained. First plaintiff would have us expand its lien to the entire 1,129 lots. Under both LSA-R.S. 9:4813 and 9:4816, the lien can only affect property owned by the defaulting contracting party or his agent, thus the trial court properly limited the lien to the 534 lots owned by Manor at the time the lien was filed.
Defendant maintains the exclusive lien right afforded engineers under the private works section of the Revised Statutes is that outlined in R.S. 9:4813 and that an engineer is not a furnisher of services or labor as contemplated under R.S. 9:4816. We disagree. What R.S. 9:4813 does for engineers and surveyors, inter alia, is to rank their lien equally with that of the contractor, while R.S. 9:4816 confers no special rank for engineering services but concerns itself with liens arising out of contemporaneous and continuing construction. We affirm the judgment of the trial court insofar as it fixes plaintiff's lien rights.
As to the liability of Trinity, we also affirm. In filing the lien bond to remove the encumbrances from Manor's property, it assumed liability for whatever amounts were due by Manor to lienors of the 534 lots it owned.
For the reasons assigned, the judgment appealed from is affirmed insofar as it recognizes plaintiff's lien on 534 lots and decrees Trinity liable under its lien bond. Insofar as it rendered a money judgment in favor of plaintiff the judgment is annulled and the case is remanded for further proceedings consistent with the views herein expressed and for the limited purpose of permitting plaintiff to adduce evidence in support of its action in quantum meruit. Defendants are to pay the cost of this appeal.
Affirmed in part; annulled in part; and remanded.

ON APPLICATIONS FOR REHEARING
PER CURIAM.
The applications for rehearing are refused.
This per curiam is written to clarify several statements in our original opinion. We inadvertently stated that the plaintiff would have this court expand its lien to include the entire 1,129 lots; whereas it is actually seeking to have incorporated in its lien against the 534 lots owned by Manor Development Corporation all of the engineering costs for the entire 1,129 lots.
This proposition is without merit. The cost of preliminary engineering services rendered to contiguous property owned by a third party cannot form the basis of a valid lien against the adjoining property of the defendant. We reiterate under both LSA-R.S. 9:4813 and 4816 the plaintiff's lien can be inscribed against only the 534 lots owned by Manor Development Corporation and only for the engineering services rendered in connection with the development of these lots.
In answer to the query directed to this court in one of the applications for rehearing, the remand of this case for the limited purpose of adducing evidence in support of the value of plaintiff's services for quantum meruit does not in any manner restrict or inhibit defendants from challenging or questioning those values either by cross-examination or by rebuttal evidence.
Rehearing refused.
NOTES
[1] Wiljon Corporation was formed in an effort to salvage a part of the loss of Trinity Universal Insurance Company under its surety bond.